City of CINCINNATI, Appellant,

v.

THOMPSON et al., Appellees.*

[Cite as *Cincinnati v. Thompson* (1994), 96 Ohio App.3d 7.]

Court of Appeals of Ohio,
Hamilton County.

No. C–920619.

Decided June 30, 1994.

* Reporter's Note: A discretionary appeal to the Supreme Court of Ohio was not allowed in (1994), 71 Ohio St.3d 1412, 641 N.E.2d 1111.

8

10

*Fay D. DuPuis,* City Solicitor, *Terrence R. Cosgrove,* City Prosecutor, and *Karla J. Burtch,* for appellant.

*Thomas W. Condit,* for appellees Charlotte Thompson, Mae Breadon, Adele Sakler, Catherine Federspiel, Kim Bush, Allen Rainey, Douglas Robinson, David Burridge, Michael Meyer, Richard Ulbrich, Lawrence Garrison, John Parker, Mathew Keck, Robert Rush, Raymond Loebker, Glen Montgomery, Joyce Anderson, Marcella Tilford, Janet Grazani, Doris Sakler, Vivan Skougard, Teresa Hurvel, Zoe Vankleek, Kristina Kelly, Marlene Avey, Allyse Kerns, Stephanie Hunley, Carolyn Knapschaeter, Orville Macomber, Todd Thompson, Robert Loreaux, Gerald Garno, Andrew Corier, Wilbert Grimme, and Steven Borchert.

*Alphonse A. Gerhardstein,* urging reversal for *amici curiae,* Cincinnati Women's Political Caucus; National Council of Jewish Women (Ohio Section); Planned Parenthood Association of Cincinnati, Inc.; Women for Women of Cincinnati; Women's Med+ Centers, Ltd.; Cincinnati Women's Services; Friends of Women's Studies Boards; and Cincinnati Chapter of the National Organization for Women.

*David M. Smolin,* Associate Professor of Law, Cumberland Law School, Samford University, urging affirmance for *amici curiae,* Rutherford Institute of Ohio; Right to Life of Greater Cincinnati, Inc.; Women Exploited By Abortion; Couple to Couple League International, Inc.; Greater Cincinnati Chapter Knights of Columbus; and Archbishop of Cincinnati.

*Per Curiam.*

This cause came on to be heard upon the appeal, the transcript of the docket, journal entries and original papers from the Hamilton County Municipal Court, the transcript of the proceedings, the briefs and the arguments of counsel.

At issue in this appeal is the constitutionality of Cincinnati Municipal Code 907–5 ("CMC 907–5"), which makes it a crime to trespass "on the land or premises of a medical facility"[1] and allows for the imposition of penalties more severe than those provided for violations of the statewide general prohibition against criminal trespass contained in R.C. 2911.21 and R.C. Chapter 2929. In its four assignments of error, the plaintiff-appellant, the city of Cincinnati ("the city"), challenges each of the four grounds upon which a judge of the Hamilton County Municipal Court relied in declaring the ordinance invalid on its face: (1) that the ordinance violates the Free Speech Clause of the First Amendment by singling out anti-abortion activists because of their views and, based upon the subject matter of their expression, subjecting them to harsher penalties than those applicable to trespassers at nonmedical facilities; (2) that the ordinance's definition of "medical facility" is "on its face * * * unconstitutionality vague and overbroad such that reasonable persons cannot be sure which locations within the City might be covered"; (3) that the ordinance violates the equal-protection guarantees of the state and federal Constitutions by singling out, without any rational basis for doing so, anti-abortion activists who trespass at abortion clinics; and (4) that the provision for mandatory penalties in the ordinance is in contravention of Section 3, Article XVIII of the Ohio Constitution to the extent that it conflicts with R.C. 2929.51, a general law of this state that makes discretionary the imposition of a term of incarceration or a fine for a misdemeanor offense. Confining ourselves solely to the questions raised about the validity of the ordinance in the context of the record generated in the municipal court, and expressing no views on the content of the ongoing public debate about abortion, we sustain all four assignments of error, reverse the judgments entered below, and remand this cause for further proceedings in accordance with law.

On June 19, 1992, not long after CMC 907–5 was enacted, the defendants-appellees, anti-abortion activists, were arrested and charged with violating the ordinance when they refused to leave the premises of the Women's Medical Center ("WMC") on East McMillan Street in Cincinnati, Ohio, after being asked to do so by personnel at the facility. The thirty-five cases were consolidated, and the defendants moved to dismiss the charges on the ground that the ordinance violated various provisions of both the Ohio Constitution and the United States Constitution. On the basis of an evidentiary hearing and the arguments of

---

1. Pursuant to CMC 907–5(E), a "medical facility" means any of the following:
 "(a) any hospital, as defined in Section 3701 of the Ohio Revised Code; or
 "(b) any clinic, office, or facility where persons receive medical examination, treatment, or advice from health care professionals, including physicians, nurses, psychologists, counselors, social workers, and physicians' assistants as defined in Title 47 of the Ohio Revised Code; or
 "(c) any clinic, office or facility where persons receive medical examination, treatment or advice from a physician as defined in Section 4730.01 of the Ohio Revised Code."

counsel, the municipal court ordered the dismissal of the charges, and this appeal by the city followed.

## FIRST AMENDMENT

We address first the challenge presented in the city's fourth assignment of error to the trial court's determination that the ordinance violates the First Amendment. We find this challenge to be well taken.

The First Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides in relevant part that "Congress shall make no law * * * abridging the freedom of speech * * *." Although the First Amendment, by its terms, forbids only the abridgment of "speech," the United States Supreme Court has "long recognized that its protection does not end at the spoken or written word * * * [and] that conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Texas v. Johnson* (1989), 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342, 353 (quoting *Spence v. Washington* [1974], 418 U.S. 405, 409, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842, 846).

While recognizing that "virtually every law restricts conduct, and virtually any prohibited conduct can be performed for an expressive purpose—if only expressive of the fact that the actor disagrees with the prohibition," *Barnes v. Glen Theatre, Inc.* (1991), 501 U.S. 560, 576, 111 S.Ct. 2456, 2466, 115 L.Ed.2d 504, 518 (Scalia, J., concurring), the court has "rejected 'the view that [a] * * * limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.'" *Johnson, supra,* 491 U.S. at 404, 109 S.Ct. at 2539, 105 L.Ed.2d at 353 (quoting *United States v. O'Brien* [1968], 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672, 679). The determination of whether conduct is sufficiently imbued with communicative elements to bring the First Amendment into play entails an inquiry into whether "[a]n intent to convey a particularized message was present, and [whether] * * * the likelihood was great that the message would be understood by those who viewed it." *Spence, supra,* 418 U.S. at 410–411, 94 S.Ct. at 2730, 41 L.Ed.2d at 847; accord *Johnson, supra,* 491 U.S. at 404, 109 S.Ct. at 2539, 105 L.Ed.2d at 353.

Applying the standard set forth in *Spence, supra,* we hold that the conduct that led to the arrests of the defendants under CMC 907-5 was sufficiently imbued with communicative elements to constitute expressive conduct. Therefore, the defendants were entitled to invoke the First Amendment in a prosecution for a violation of the ordinance.

The First Amendment has never conferred an absolute right to engage in expressive conduct whenever, wherever or in whatever manner a speaker may

choose. *Greer v. Spock* (1976), 424 U.S. 828, 836, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505, 513; *Adderly v. Florida* (1966), 385 U.S. 39, 48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149, 156. The degree of First Amendment protection varies with, *inter alia*, the forum in which expression occurs. *Internatl. Soc. for Krishna Consciousness, Inc. v. Lee* (1992), 505 U.S. ——, ——, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541, 549–550; *United States v. Kokinda* (1990), 497 U.S. 720, 726, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571, 581.

The right to engage in expressive conduct is at its most attenuated when the forum is private property, because the rights of the property owner and his invitees are brought into play.[2] The United States Supreme Court has recognized that the interest in personal autonomy that underlies the First Amendment right of free speech also promotes a right to be let alone, which "must be placed in the scales with the right * * * to communicate" when the interests of a speaker collide with those of an unwilling listener. *Rowan v. United States Post Office Dept.* (1970), 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736, 742–743; see *Lehman v. Shaker Hts.* (1974), 418 U.S. 298, 302, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770, 776–777 citing *Pub. Util. Comm. v. Pollak* (1952), 343 U.S. 451, 468, 72 S.Ct. 813, 823, 96 L.Ed. 1068, 1080 (Douglas, J., dissenting) ("The First Amendment in its respect for the conscience of the individual honors the sanctity of thought and belief. To think as one chooses, to believe as one wishes, are important aspects of the constitutional right to be let alone."); accord *Pro–Choice Network v. Project Rescue* (W.D.N.Y.1992), 799 F.Supp. 1417, 1435; see, also, *Frisby v. Schultz* (1988), 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (right of listener is paramount when listener is a "captive audience," *i.e.*, when listener is subjected to unwanted communication under circumstances in which communication cannot be avoided).

The "right to exclude others" has also been held to constitute "a fundamental element of private property ownership." See *Armes v. Philadelphia* (E.D.Pa.1989), 706 F.Supp. 1156, 1164 (citing *Kaiser Aetna v. United States* [1979], 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332, and *Hudgens v. Natl. Labor Relations Bd.* [1976], 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196); *Eastwood*

---

2. We note that the First and Fourteenth Amendments safeguard the right of free speech by imposing limitations on state action, not on action by an owner of private property used nondiscriminatorily for private purposes only. See *Lloyd Corp. v. Tanner* (1972), 407 U.S. 551, 567, 92 S.Ct. 2219, 2228, 33 L.Ed.2d 131, 141–142. The use of trespass laws to exclude trespassers on private property may, however, be viewed as a "delegat[ion to an owner of private property of the state's] power." *Amalgamated Food Employees Union v. Logan Valley Plaza, Inc.* (1968), 391 U.S. 308, 319–320, 88 S.Ct. 1601, 1609, 20 L.Ed.2d 603, 612–613; see, also, *Cent. Hardware Co. v. NLRB* (1972), 407 U.S. 539, 547, 92 S.Ct. 2238, 2243, 33 L.Ed.2d 122, 128–129; *Fairfield Commons Condominium Assn. v. Stasa* (1985), 30 Ohio App.3d 11, 18–19, 30 OBR 49, 55–58, 506 N.E.2d 237, 245.

*Mall v. Slanco* (1994), 68 Ohio St.3d 221, 223, 626 N.E.2d 59, 61; *Bresnick v. Beulah Park Ltd. Partnership* (1993), 67 Ohio St.3d 302, 303, 617 N.E.2d 1096, 1097 ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."). Also implicated are the Due Process Clauses of the Fifth and Fourteenth Amendments, which provide that "[n]o person shall * * * be deprived of * * * property, without due process of law," the Fifth Amendment proscription on the taking of "private property * * * for public use, without just compensation," and Section 19, Article I of the Ohio Constitution, which provides that "[p]rivate property shall ever be held inviolate, but subservient to the public welfare." Therefore, when a speaker seeks to deliver his message on private property, competing constitutional rights are implicated, and his First Amendment rights must be balanced against the constitutionally secured rights of the property owner.

For purposes of the First Amendment, "[o]wnership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more * * * his rights become circumscribed by the statutory and constitutional rights of those who use it." *Marsh v. Alabama* (1946), 326 U.S. 501, 506, 66 S.Ct. 276, 278, 90 L.Ed. 265, 268. Property does not, however, "lose its private character merely because the public is generally invited to use it for designated purposes." *Lloyd Corp. v. Tanner* (1972), 407 U.S. 551, 569, 92 S.Ct. 2219, 2229, 33 L.Ed.2d 131, 143. A private property owner cannot be subjected to the First and Fourteenth Amendment rights of others unless the "property * * * assume[s] to some significant degree the functional attributes of public property devoted to public use." *Cent. Hardware Co. v. NLRB* (1972), 407 U.S. 539, 547, 92 S.Ct. 2238, 2243, 33 L.Ed.2d 122, 128; see, also, *Lloyd Corp., supra,* 407 U.S. at 567–568, 92 S.Ct. at 2228, 33 L.Ed.2d at 141–142 (notwithstanding special solicitude for First Amendment guarantees, accommodating values protected by the First, Fourteenth and Fifth Amendments has yet to cause the court to hold that trespasser may exercise free-speech rights on private property used for private purposes only).

The defendants concede that the premises of the WMC are privately owned. The record before us is otherwise devoid of evidence upon which we might conclude that the medical facility where the defendants were arrested had assumed to any degree the functional attributes of public property. See, *e.g., Akron v. Wendell* (1990), 70 Ohio App.3d 35, 590 N.E.2d 380 (anti-abortion activists charged with disorderly conduct and criminal trespass had no First Amendment right to assemble in clinic's semi-private parking lot or sidewalk open only to those doing business therein); *Akron v. Detwiler* (July 5, 1990), Summit App. No. 14385, unreported, 1990 WL 95683 (anti-abortion activists charged with criminal trespass, disorderly conduct and resisting arrest had no

First Amendment right to engage in expressive conduct on clinic property, which "[did] not lose its private character merely because the public [was] generally invited to use it for designated purposes" or because the premises were occupied by more than one tenant); *Cleveland v. Sundermeier* (1989), 48 Ohio App.3d 204, 549 N.E.2d 561 ("quasi-public" nature of abortion clinic parking lot did not constitute significant attribute of public property so as to confer on anti-abortion activists a First Amendment right to trespass); *Fairfield Commons Condominium Assn. v. Stasa* (1985), 30 Ohio App.3d 11, 30 OBR 49, 506 N.E.2d 237 (injunction barring anti-abortion activists from picketing on property of professional condominium complex and confining protest to sidewalk fronting property was not violative of First Amendment when property "had more indicia of privateness than the shopping mall in Lloyd * * *"); *Columbus v. Kasper* (Dec. 23, 1987), Franklin App. No. 87AP–508, unreported, 1987 WL 31290 (anti-abortion activists charged with criminal trespass did not have First Amendment right to distribute literature at Jewish community center health fair to which public was invited); see, also, *Armes, supra* (city's enforcement of trespass law to exclude from grounds of private clinic anti-abortion activists who had no proper business purpose there did not constitute violation of First Amendment). We, therefore, conclude that the defendants had no First Amendment right to engage in expressive conduct on the premises of the WMC,[3] and that CMC 907–5, as applied to them, was erroneously held to give rise to a First Amendment violation. See *Armes, supra,* 706 F.Supp. at 1165, fn. 7, for a list of cases holding that anti-abortion activists have no First Amendment or corresponding state constitutional right to protest on the grounds of private medical clinics.

■ We also find the trial court's reliance on the United States Supreme Court's decision in *R.A.V. v. City of St. Paul, Minnesota* (1992), 505 U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305, to be misplaced. In *R.A.V.,* the court addressed a First Amendment challenge to a municipal ordinance prohibiting the use of " 'fighting words' that insult, or provoke violence, 'on the basis of race, color, creed, religion or gender' " and held that the ordinance was unconstitutional on

---

3. We note that the Ohio Constitution also confers a right of free expression, providing in Section 11, Article I that "[e]very citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press." The Ohio Supreme Court, however, has held that the protections afforded by Section 11, Article I are no broader than the protections afforded under the First Amendment and that the First Amendment is a proper basis for interpreting Section 11, Article I. Thus, Section 11, Article I will not operate to protect expressive conduct on private property when the First Amendment would not. *Eastwood Mall, supra,* 68 Ohio St.3d at 222–223, 626 N.E.2d at 61; accord *Sundermeier, supra; Wendell, supra* (neither the First Amendment nor Section 11 free-speech guarantees precluded arrest and conviction of anti-abortion activists for trespassing on parking lot of private abortion clinic).

its face because it discriminated on the basis of the content of the speech. The ordinance struck down in *R.A.V.* was, by its terms, directed at speech, while the ordinance at issue here is, by its terms, aimed at conduct unprotected by the First Amendment.[4] Therefore, the decision in *R.A.V.* does not compel a contrary result. See *Wisconsin v. Mitchell* (1993), 508 U.S. ——, —— – ——, 113 S.Ct. 2194, 2200–2201, 124 L.Ed.2d 436, 445–448.

Upon our determination that enforcement of CMC 907–5 to exclude the defendants from engaging in expressive conduct on the premises of the WMC did not constitute a violation of the First Amendment, we sustain the city's fourth assignment of error.

## OVERBREADTH AND VAGUENESS

We turn next to the challenge advanced in the city's second assignment of error to the trial court's determination that the ordinance is unconstitutionally vague and overbroad because it defines a "medical facility" in such a way "that reasonable persons cannot be sure which locations in the city might be covered." (Citing *Grayned v. Rockford* [1972], 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222.) We find this challenge to be equally meritorious.

An overbreadth challenge is predicated on the proposition that "[a] clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." In addressing an overbreadth challenge, the "crucial question * * * is whether the [legislation] sweeps within its prohibitions what may not be punished under the First * * * Amendment[ ]." *Grayned, supra,* at 114–115, 92 S.Ct. at 2302, 33 L.Ed.2d at 231.

---

**4.** Under the First Amendment, government may not restrict expression because of its message, ideas, subject matter, or content. *Hudgens, supra,* 424 U.S. at 520, 96 S.Ct. at 1036, 47 L.Ed.2d at 207. The court in *R.A.V.* noted the well-settled proposition that "a particular instance of speech can [consistent with the First Amendment] be proscribable on the basis of one feature * * * but not on the basis of another * * *." Thus, "nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses—so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not." *R.A.V., supra,* 505 U.S. at ——, 112 S.Ct. at 2544, 120 L.Ed.2d at 319 (citing *Johnson, supra* ). In determining whether legislation proscribes expressive conduct because of the action entailed or the ideas expressed, the Supreme Court has been reluctant to attribute unconstitutional motives to the state, particularly when a permissible purpose may be discerned from the face of the statute. *United States v. O'Brien* (1968), 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672, 683–684 ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."); accord *Palmer v. Thompson* (1971), 403 U.S. 217, 224–225, 91 S.Ct. 1940, 1944–1945, 29 L.Ed.2d 438, 444–445 (motive analysis disfavored because legislative motive is difficult to discern and invalidation will prove futile if legislation can be reenacted for valid reason); see, also, Tribe, American Constitutional Law (2 Ed.1988) 816–821, Section 12–5, for a discussion of motive analysis in First Amendment jurisprudence.

As we determined *supra,* the city's enforcement of its trespass ordinance to exclude the defendants from engaging in expressive conduct on the premises of the WMC did not constitute a violation of the First Amendment. Therefore, with respect to the defendants, the ordinance cannot be said to "sweep[ ] within its prohibitions what may not be punished under the First * * * Amendment[ ]."

■ With respect to third-party rights, the United States Supreme Court has, as a general rule, observed a "prudential-standing limitation," by which a party is limited to "assert[ing] his own legal rights and interests, and cannot rest his claim * * * on the legal rights or interests of third parties." *Secretary of State of Maryland v. Joseph H. Munson Co., Inc.* (1984), 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786, 795, fn. 5 (quoting *Warth v. Seldin* [1975], 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 355). The court in *Broadrick v. Oklahoma* (1973), 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830, noted that "constitutional rights are personal" and found "[e]mbedded in the traditional rules governing constitutional adjudication * * * the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Id.* at 610, 93 S.Ct. at 2915, 37 L.Ed.2d at 839. However, based upon "a judicial prediction or assumption that [a] statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression," the court has carved out a limited exception to this principle in First Amendment cases. *Id.* at 612, 93 S.Ct. at 2916, 37 L.Ed.2d at 840. The exception permits an individual whose own speech or conduct may, consistent with the First Amendment, be proscribed to challenge a statute as unconstitutionally overbroad on its face. *Id.;* accord *Munson, supra,* 467 U.S. at 957, 104 S.Ct. at 2847, 81 L.Ed.2d at 796; *R.A.V., supra,* 505 U.S. at ——, 112 S.Ct. at 2558, 120 L.Ed.2d at 336–337 (White, J., concurring).

■ The court in *Broadrick* noted:

"[F]acial overbreadth adjudication is an exception to our traditional rules of practice and * * * its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admitted-

ly within its power to proscribe." *Id.*, 413 U.S. at 615, 93 S.Ct. at 2917–2918, 37 L.Ed.2d at 842.

The court thus held that legislation that regulates conduct rather than "pure speech" can be invalidated as unconstitutionally overbroad on its face only if the overbreadth is shown to be "real [and] substantial * * *, judged in relation to the statute's plainly legitimate sweep," [5] and the statute is not susceptible of a limiting construction or impartial invalidation. *Id.* at 613, 615, 93 S.Ct. at 2916, 2918, 37 L.Ed.2d at 840–841, 842. In *New York v. Ferber* (1982), 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113, the court extended the substantiality requirement to all First Amendment overbreadth challenges. See *id.* at 769, 772–773, 102 S.Ct. at 3361, 3363, 73 L.Ed.2d at 1130–1131, 1132–1133, fn. 24 ("requirement of substantial overbreadth may justifiably be applied to statutory challenges which arise in defense of a criminal prosecution," and statute susceptible of limiting construction should be so construed to avoid constitutional problems).

In addressing a facial-overbreadth challenge, a court must first determine whether the legislation reaches a substantial amount of constitutionally protected conduct. *Houston v. Hill* (1987), 482 U.S. 451, 458–459, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398, 410; *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.* (1982), 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362, 368–369. This assessment must be based on the text of the legislation and on any judicially imposed limiting construction. *Boos v. Barry* (1988), 485 U.S. 312, 329, 108 S.Ct. 1157, 1168, 99 L.Ed.2d 333, 349–350; *Kolender v. Lawson* (1983), 461 U.S. 352, 355, 103 S.Ct. 1855, 1857, 75 L.Ed.2d 903, 908–909; *Hoffman Estates, supra*, 455 U.S. at 494, 102 S.Ct. at 1191, 71 L.Ed.2d at 369, fn. 5.

Legislation will not be invalidated as overbroad simply because constitutionally impermissible applications of the legislation are conceivable. Rather,

---

**5.** Some courts, in construing the substantiality requirement, have posed it as an issue of a party's "standing" to raise a First Amendment overbreadth challenge. See, *e.g., Members of City Council v. Taxpayers for Vincent* (1984), 466 U.S. 789, 802, 104 S.Ct. 2118, 2127, 80 L.Ed.2d 772, 785; *Lorain v. Davidson* (1989), 65 Ohio App.3d 408, 412–414, 584 N.E.2d 744, 746–747. Any confusion in this regard must be said to have been obviated by Justice Blackmun's explanation in his plurality opinion in *Munson, supra*, that the issue of whether overbreadth is substantial "is one that is more properly reserved for the determination of [a party's] First Amendment challenge on the merits. The requirement that a statute be 'substantially overbroad' before it will be struck down on its face is a 'standing' question only to the extent that if [a party] does not prevail on the merits of its facial [overbreadth] challenge and cannot demonstrate that, as applied to it, the statute is unconstitutional, it has no 'standing' to allege that, as applied to others, the statute might be unconstitutional." *Id.*, 467 U.S. at 959, 104 S.Ct. at 2848, 81 L.Ed.2d at 797. Standing to raise a First Amendment facial overbreadth challenge is thus conferred, not by a finding that the overbreadth is substantial, but by the narrow exception carved out in First Amendment cases to the principle barring the assertion of third-party rights by one to whom a statute may constitutionally be applied.

"there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court * * *." *Members of City Council v. Taxpayers for Vincent* (1984), 466 U.S. 789, 801–802, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772, 784–785.

Finally, a court has a "duty to adopt that construction which will save [a] statute from constitutional infirmity." *United States ex rel. Atty. Gen. v. Delaware & Hudson Co.* (1909), 213 U.S. 366, 407, 29 S.Ct. 527, 535, 53 L.Ed. 836, 849. Thus, as a general rule, facial overbreadth will not operate to invalidate a statute upon which a limiting and saving construction has been or could be placed. *Broadrick, supra,* 413 U.S. at 614, 93 S.Ct. at 2916, 37 L.Ed.2d at 841. More to the point, when enforcement of a statute proscribing criminal conduct is sought against constitutionally protected conduct, the common practice is not to invalidate the law in its entirety, but to reverse the defendant's conviction. *Ferber, supra,* 458 U.S. at 773, 102 S.Ct. at 3363, 73 L.Ed.2d at 1133; *Broadrick, supra,* 413 U.S. at 614–615, 93 S.Ct. at 2917, 37 L.Ed.2d at 841–842.

 Applying these principles, we hold that CMC 907–5 is not facially overbroad in contravention of the free-speech guarantees of the First Amendment.

As we noted *supra,* the degree of protection afforded expression by the First Amendment varies with, *inter alia,* the forum in which the expression occurs. In our disposition of the city's fourth assignment of error, we held that, in the absence of evidence that the privately owned WMC had assumed to a significant degree the functional attributes of public property, the city may, consistent with the First Amendment, enforce CMC 907–5 to preclude the defendants from engaging in expressive conduct on center property. Thus, with respect to the First Amendment claims personal to the defendants, the private nature of the subject forum was outcome-determinative.

 We also noted, however, the Supreme Court's admonition in *Marsh, supra,* that private property "[o]wnership does not always mean absolute dominion[, and that t]he more an owner [of property], for his advantage, opens up his property for use by the public in general, the more [do] his rights become circumscribed by the * * * constitutional rights of those who use it." *Id.,* 326 U.S. at 506, 66 S.Ct. at 278, 90 L.Ed. at 268. Thus, with respect to government-owned property, the court has held the First Amendment to permit, in a public forum, a content-based regulation of expressive conduct only if it serves a compelling state interest and is narrowly drawn and a "time, place and manner" regulation of expressive conduct only if it is content-neutral, serves a significant governmental interest and leaves open adequate alternative channels for communication. In a nonpublic forum, *i.e.,* a government-owned institution performing a

nonspeech-related function, the court has held the First Amendment to permit a regulation of expression only if the regulation is content-neutral, is rationally related to a governmental interest, and allows ample alternative avenues of communication. *Perry Edn. Assn. v. Perry Local Educators' Assn.* (1983), 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–955, 74 L.Ed.2d 794, 804–805. Therefore, a regulation of expressive conduct on other than private property or on private property devoted to other than a private purpose is subject to a heightened level of scrutiny.

We find that, for purposes of analysis under the facial-overbreadth doctrine, CMC 907–5 defines a "medical facility" in such a way that enforcement of the ordinance on government-owned property or on private property that has assumed to a significant degree the functional attributes of public property is conceivable. However, the defendants have offered no evidence demonstrating the extent to which the ordinance might reach expressive conduct on other than private property or on private property used for other than a private purpose. Additionally, the ordinance is neutral on its face as to the ideas or viewpoints expressed by those engaged in trespassing, the conduct proscribed, and it advances a legitimate governmental interest in assuring the function and effectiveness of facilities providing medical care. See *Armes, supra,* 706 F.Supp. at 1165, citing *Cornelius v. NAACP Legal Defense & Edn. Fund* (1985), 473 U.S. 788, 800, 811, 105 S.Ct. 3439, 3448, 3454, 87 L.Ed.2d 567, 578–579, 585–586 (First Amendment permits exclusion from nonpublic forum of speakers who would disrupt function of the forum and would hinder its effectiveness for its intended purpose, provided regulation is reasonable, content-neutral, and allows ample alternative avenues of communication). Finally, the relevant considerations of whether a private medical facility has assumed the functional attributes of public property and whether the ordinance permits ample alternative avenues of communication present factual issues that cannot be resolved in a vacuum.

The combination of these factors makes highly speculative a judicial determination that the city's enforcement of the ordinance in a more "public" forum would not, in a substantial number of cases, survive a heightened level of First Amendment scrutiny. Because we are unable to conclude that CMC 907–5 sweeps within its prohibitions a substantial amount of protected conduct and because we perceive it to be susceptible of a saving construction, we hold that the ordinance is not substantially overbroad and that "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its [prohibitions], assertedly, may not be applied." *Broadrick, supra,* 413 U.S. at 615–616, 93 S.Ct. at 2918, 37 L.Ed.2d at 842, (quoted in *Ferber, supra,* 458 U.S. at 773–774, 102 S.Ct. at 3363, 73 L.Ed.2d at 1133). Cf. *Bd. of Airport Commrs. v. Jews for Jesus, Inc.* (1987), 482 U.S. 569, 574–576, 107 S.Ct. 2568, 2572, 96

L.Ed.2d 500, 507–509, (resolution of board of airport commissioners prohibiting all "First Amendment activities" in terminal area was substantially overbroad and was not susceptible of a saving construction).

We further hold that the trial court erred in holding the statute void for vagueness.

Under the vagueness doctrine, which is premised on the Fourteenth Amendment due-process requirement that a "law give fair notice of offending conduct," a statute is void for vagueness if it " 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute' * * * [or if] it encourages arbitrary and erratic arrests and convictions." *Papachristou v. Jacksonville* (1972), 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110, 115–116 (quoting *United States v. Harriss* [1954], 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989, 996).

In the proceedings below, the challenge advanced by the defendants and the court's disposition thereof were predicated, not on the arbitrary-enforcement aspect, but on the fair-notice aspect of the vagueness doctrine. The defendants cannot, however, plausibly argue that the ordinance failed to give fair notice of the criminality of their own conduct on the premises of the WMC when the thrust of their First Amendment challenge was that the city enacted the ordinance expressly for the purpose of excluding anti-abortion activists from engaging in expressive conduct on the premises of medical facilities that provide abortion services. Therefore, the defendants cannot sustain a vagueness challenge with respect to the due-process rights personal to them.

With respect to third-party rights, "the alleged vagueness of a criminal statute [generally] must be judged in light of the conduct that is charged to be violative of the statute. * * * If the actor is given sufficient notice that his conduct is within the proscription of the statute, his conviction is not vulnerable on vagueness grounds, even if as applied to other conduct, the law would be unconstitutionally vague." *Kolender, supra,* 461 U.S. at 369, 103 S.Ct. at 1864–1865, 75 L.Ed.2d at 917 (White, J., dissenting.) Thus, the general rule is that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness," *Parker v. Levy* (1974), 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439, 458, and its corollary is that a statute is not unconstitutionally vague on its face unless it is "impermissibly vague in all of its applications." *Hoffman Estates, supra,* 455 U.S. at 497, 102 S.Ct. at 1193, 71 L.Ed.2d at 371.

As we noted above, the court below found CMC 907–5 both unconstitutionally overbroad and void for vagueness, upon its determination that the ordinance defines a "medical facility" in such a way "that reasonable persons cannot be sure which locations in the city might be covered." Although the court's disposition

suggests a failure to appreciate any distinction, "[v]agueness is a constitutional vice conceptually distinct from overbreadth in that an overbroad law need lack neither clarity nor precision, and a vague law need not reach activity protected by the [F]irst [A]mendment." Tribe, *supra*, at 1033, Section 12–31.

In the First Amendment context, however, vagueness is "logically related and similar" to overbreadth in that a vague law that can be construed to reach a substantial amount of protected expression may also be said to suffer the constitutional infirmity of overbreadth. *Kolender, supra*, 461 U.S. at 359, 103 S.Ct. at 1859, 75 L.Ed.2d at 910 fn. 8. Similarly, when a statute implicates First Amendment rights, the overbreadth and the vagueness doctrines can be employed to serve similar purposes in minimizing the chilling effect of the law on constitutionally protected expression and in reducing the risk of its "selective enforcement against unpopular causes." *NAACP v. Button* (1963), 371 U.S. 415, 435, 83 S.Ct. 328, 339, 9 L.Ed.2d 405, 419; see Fallon, Making Sense of Overbreadth (1991), 100 Yale L.J. 853, 904–905. In recognition of these principles, the Supreme Court has effectively created a separate vagueness doctrine in First Amendment cases, pursuant to which a statute is subject to invalidation for facial vagueness if it reaches a "substantial amount" of protected conduct. *Kolender, supra*, 461 U.S. at 359, 103 S.Ct. at 1859, 75 L.Ed.2d at 910, fn. 8.[6]

As we determined *supra*, CMC 907–5 is neutral on its face as to the ideas or viewpoints expressed by those engaged in the conduct proscribed, and it cannot be said to implicate a substantial amount of protected conduct. We, therefore, hold that the ordinance is not facially vague in violation of the First Amendment.

Thus, upon our determination that CMC 907–5 is not unconstitutionally overbroad or vague, we sustain the city's second assignment of error.

## EQUAL PROTECTION

We find equally meritorious the challenge presented in the city's third assignment of error to the trial court's determination that enforcement of CMC 907–5 to exclude the defendants from the premises of the WMC constituted a

---

6. Professor Fallon notes that, although the majority in *Kolender* rejected "the dissent's view," which would confine a vagueness challenge (unlike an overbreadth challenge) to a statute's constitutionality "as applied," the court "has sent mixed signals as to whether a party may challenge a statute [that] clearly applies to her conduct, on the ground that it would be impermissibly vague as applied to the different conduct of someone else." Fallon, *supra*, at 904, fn. 309 (comparing *Gooding v. Wilson* [1972], 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408, with *Broadrick, supra*).

violation of the equal-protection guarantees of the Fourteenth Amendment and Section 2, Article I of the Ohio Constitution.[7]

As we determined above, the defendants did not have a First Amendment or other constitutionally secured right to engage in expressive conduct on the premises of the WMC. Therefore, the ordinance need not be subjected to the strict scrutiny applicable when government action impinges upon a fundamental right protected by the Constitution; it need only rationally further a legitimate state interest. See *Perry Edn. Assn., supra*, 460 U.S. at 54, 103 S.Ct. at 960, 74 L.Ed.2d at 810–811.[8]

CMC 907–5 proscribes the act of trespassing on the premises of a "medical facility" and imposes increasingly greater penalties for multiple violations of the ordinance. Section 2 of the ordinance characterizes it as an "emergency" measure, "necessary for the public safety, health and welfare," and states its legislative purpose "to provide adequate protection and right of entry for medical facilities and the users thereof."

The preamble to CMC 907–5 states that, in nine instances since 1987, blockades and acts of trespass on the premises of medical facilities in the city providing reproductive health care for women have prevented access to those facilities by women in need of such care. The evidence presented on the motion to dismiss discloses, *inter alia*, that sixty of the two hundred fifty-three arrests made at those medical facilities constituted repeat offenses. The preamble also makes

---

7. Section 2, Article I provides no greater protection than the Equal Protection Clause of the Fourteenth Amendment. *Sedar v. Knowlton Const. Co.* (1990), 49 Ohio St.3d 193, 551 N.E.2d 938.

8. It is conceivable, as it was for purposes of our analyses under the overbreadth and vagueness doctrines, that the ordinance could be enforced under circumstances that would bring the First Amendment and thus, for purposes of an equal-protection analysis, strict scrutiny into play. However, the defendants have no standing to mount a third-party equal-protection challenge to the ordinance when the relationship of the defendants to a third party whose conduct is constitutionally protected cannot be said to be such that the defendants would function as "fully, or very nearly, as effective * * * proponent[s] of the [third party's] right[s] as [the third party himself]," and when there is no obstacle to the ability of such a third party prosecuted under the ordinance to assert his own rights. See *Powers v. Ohio* (1991), 499 U.S. 400, 400–415, 111 S.Ct. 1364, 1370–1373, 113 L.Ed.2d 411, 411–428; *Singleton v. Wulff* (1976), 428 U.S. 106, 113–118, 96 S.Ct. 2868, 2873, 2876, 49 L.Ed.2d 826, 832–836, see, also, *Barrows v. Jackson* (1953), 346 U.S. 249, 256, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586, 1595 (general rule is that one against whom statute may, consistent with the equal protection guarantees of the Fourteenth Amendment, be enforced has no standing to claim that enforcement of statute against another might constitute a denial of equal protection); *Carey v. Brown* (1980), 447 U.S. 455, 487–489, 100 S.Ct. 2286, 2304–2305, 65 L.Ed.2d 263, 286–288 (Rehnquist, J., dissenting) ("In the equal protection context, * * * we are not concerned that conduct which must be permitted under the First Amendment will be prohibited, but only that conduct which could be and is properly prohibited be permitted if indistinguishable from other permitted conduct.").

reference to "repeat offenders" and suggests that multiple convictions under the existing state law proscribing criminal trespass have proved ineffective in curbing recidivist conduct.

Legislation that proscribes criminal trespass rationally advances legitimate governmental concerns with preventing disruptive and unsafe conduct and with securing the First, Fifth and Fourteenth Amendment rights of a property owner and his invitees. To the extent that its proscriptions are aimed specifically at conduct on the premises of a "medical facility," CMC 907-5 advances a legitimate governmental interest in facilitating access to health care generally and to reproductive health care for women specifically, including those women seeking to exercise their constitutionally secured rights pursuant to *Roe v. Wade* (1973), 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, and its progeny. See *Gregory v. Chicago* (1969), 394 U.S. 111, 118, 89 S.Ct. 946, 950, 22 L.Ed.2d 134, 140 ("[N]o mandate in our Constitution leaves * * * governmental units powerless to pass laws to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of * * * buildings that require peace and quiet to carry out their functions, such as * * * hospitals."); accord *Carey v. Brown* (1980), 447 U.S. 455, 470, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263, 275-276. Finally, that portion of the ordinance which imposes greater penalties on multiple offenders rationally furthers a legitimate governmental interest in discouraging recidivist conduct.

In reaching our conclusions, we reject the appellees' argument, which was endorsed by the court below, that CMC 907-5 "classifies, selects and singles out" for special treatment a narrow group of individuals who oppose or protest abortion. That this is not the case is plain from a reading of the enactment itself. By its terms, the ordinance classifies or distinguishes solely on the basis of the site of a trespass, not on the basis of the identity of the trespassers, their motives for trespassing, or any viewpoints they may be seeking to express. We are not, therefore, confronted here with the sort of regulatory distinction among different kinds of speech that has been recognized to give rise to violations of the Equal Protection Clause. See *Ladue v. Gilleo* (1994), 512 U.S. ——, ——, 114 S.Ct. 2038, 2043, 129 L.Ed.2d 36, 45, fn. 9; *Carey v. Brown, supra* (exemption of labor picketing from general picketing prohibition): *Police Dept. of Chicago v. Mosley* (1972), 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (distinction between labor and nonlabor picketing).

Accordingly, upon our determination that CMC 907-5 rationally furthers legitimate governmental interests, we hold that the trial court erred in finding that the ordinance violates the equal-protection guarantees of the United States and Ohio Constitutions. We sustain the city's third assignment of error.

## HOME RULE

In its first assignment of error, the city contends that the court below erred in holding that CMC 907–5 is "in conflict" with R.C. 2929.51, in contravention of Section 3, Article XVIII of the Ohio Constitution. We agree.

■ The power of an Ohio municipality to enact local police regulations is no longer dependent upon enabling legislation, as it was prior to 1912, but is conferred under the so-called "home rule," Section 3, Article XVIII of the Ohio Constitution, which grants municipalities the " 'authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.' " *W. Jefferson v. Robinson* (1965), 1 Ohio St.2d 113, 115, 30 O.O.2d 474, 475, 205 N.E.2d 382, 385. A municipality may, therefore, adopt and enforce within its limits an ordinance which constitutes an "exercise [of its] power[ ] of local self-government" or a "police, sanitary or other similar regulation[ ]," but an ordinance enacted pursuant to the municipality's police powers must yield to a state statute when (1) the state statute is a "general law[ ]," and (2) the ordinance is "in conflict" with the state statute, within the meaning of Section 3, Article XVIII. *Auxter v. Toledo* (1962), 173 Ohio St. 444, 20 O.O.2d 71, 183 N.E.2d 920; accord *Ohio Assn. of Private Detective Agencies, Inc. v. N. Olmsted* (1992), 65 Ohio St.3d 242, 602 N.E.2d 1147.

■ CMC 907–5, in proscribing the act of criminal trespass on medical premises and prescribing the penalties therefor, indisputably constitutes an exercise by the city of its police powers. The defendants assert, however, that the ordinance, to the extent that it provides for mandatory fines and terms of confinement, is in conflict with R.C. 2929.51, specifically subsection (D) thereof, which sets forth the circumstances under which a court may suspend a sentence of confinement imposed for a misdemeanor and place the offender on probation.[9] This argument is untenable.

---

9. R.C. 2929.51(D) provides:

"(D) At the time of sentencing and after sentencing, when imprisonment for misdemeanor is imposed, the court may:

"(1) Suspend the sentence and place the offender on probation pursuant to section 2951.02 of the Revised Code;

"(2) Suspend the sentence pursuant to section 2951.02 of the Revised Code upon any terms that the court considers appropriate;

"(3) Permit the offender to serve his sentence in intermittent confinement, overnight, or on weekends, or both, or at any other time or times that will allow him to continue his occupation or care for his family;

"(4) Require the offender to serve a portion of his sentence, which may be served in intermittent confinement, and suspend the balance of the sentence pursuant to section

R.C. 2929.51 and 2951.02 together set forth a sentencing scheme applicable to misdemeanors that may be characterized as "general * * * in the limited sense that it operates uniformly throughout the state." It does not, however, constitute "a general law in the sense of prescribing a rule of conduct upon citizens generally," and if it were construed (as the defendants would have it) to require that all misdemeanors except those enumerated therein be probational, the state's sentencing scheme would operate to impose an "indirect" limitation upon the legislative authority conferred upon a municipality by the state constitution. See *Youngstown v. Evans* (1929), 121 Ohio St. 342, 345–346, 168 N.E. 844, 845; see, also, *Robinson, supra*, 1 Ohio St.2d at 117–118, 30 O.O.2d at 476–477, 205 N.E.2d at 386, and paragraph three of the syllabus (state statute does not constitute "general law[ ]" for purposes of Section 3, Article XVIII if it merely purports to grant or limit legislative powers of municipal corporation to adopt or enforce police, sanitary or other similar regulations); accord *Columbus v. Kemper* (1992), 82 Ohio App.3d 49, 610 N.E.2d 1194; *Cincinnati v. Shannon* (1979), 64 Ohio App.2d 58, 18 O.O.3d 40, 410 N.E.2d 1265. We, therefore, hold that R.C. 2929.51 does not constitute a "general law[ ]" for purposes of Section 3, Article XVIII. See *Columbus v. Molt* (1973), 36 Ohio St.2d 94, 65 O.O.2d 244, 304 N.E.2d 245 (R.C. 4511.99[F], providing the penalty for a violation of the reckless-operation statute, and R.C. 4511.06, providing for the uniform application and precedence of traffic laws, are not "general laws" within the meaning of Section 3, Article XVIII); accord *Kemper, supra*.

 We further hold that, even if the sentencing scheme that emerges from R.C. 2929.51 and 2951.02 can be read *in pari materia* with R.C. 2911.21, proscribing criminal trespass, and R.C. 2929.21 and 2929.22, prescribing the penalties and the sentencing criteria for a misdemeanor, to constitute a "general law[ ]" of the state upon the subject of criminal trespass comparable to CMC 907–5, the ordinance is not "in conflict" with the state's statutory scheme.

 The test for determining whether a local ordinance conflicts with a state statute within the meaning of Section 3, Article XVIII is whether the ordinance permits or licenses that which the statute prohibits or vice versa. *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519. CMC 907–5 and R.C. 2911.21 define criminal trespass in identical terms. A violation of the ordinance

---

2951.02 of the Revised Code upon any terms that the court considers appropriate, or suspend the balance of the sentence and place the offender on probation pursuant to that section."

R.C. 2951.02 sets forth the criteria for determining whether a sentence of imprisonment should be suspended and probation imposed and the conditions under which a court may or may not do so.

constitutes a first-degree misdemeanor and, for a first-time offender, results in the imposition of a mandatory sentence of three days' imprisonment, with a fine ranging from $150 to $1,000. For repeat offenses within five years, the ordinance imposes a mandatory six days' imprisonment and a fine ranging from $300 to $1,000. Three or more convictions within a five-year period result in the imposition of twelve days' imprisonment and a $600-to-$1,000 fine. In contrast, a violation of R.C. 2911.21 constitutes a fourth-degree misdemeanor and, regardless of prior convictions thereunder, may result in a maximum term of incarceration of thirty days and a maximum fine of $250. R.C. 2929.21. A municipal ordinance that increases the penalty for a crime, but does not change the classification of the offense from a misdemeanor to a felony, is not "in conflict" with a state statute on the same subject within the meaning of Section 3, Article XVIII. *Niles v. Howard* (1984), 12 Ohio St.3d 162, 165, 12 OBR 232, 234–235, 466 N.E.2d 539, 541. CMC 907–5 neither permits conduct that the state statutory scheme prohibits nor prohibits conduct that the state statutory scheme permits; it merely permits a court to impose a greater penalty for the act of trespassing on the premises of a medical facility. Upon our determination that CMC 907–5 is not in conflict with a general law of the state, we sustain the city's first assignment of error.

Finding no constitutional violations to support an invalidation of CMC 907–5 in the context of this case, we reverse the judgments of the court below and remand this cause for further proceedings consistent with law and this decision.

*Judgments reversed*
*and cause remanded.*

DOAN, P.J., HILDEBRANDT and GORMAN, JJ., concur.