**[Cite as *In re S.J.*, 2023-Ohio-3441.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE S.J., A MINOR CHILD. | : | APPEAL NOS. C-220221 |
| | | C-220222 |
| | : | C-220223 |
| | | C-220224 |
| | : | TRIAL NOS. 20-3335Z |
| | | 20-3336Z |
| | : | 20-3337Z |
| | | 20-3338Z |
| | : | *O P I N I O N*. |

Appeals From:   Hamilton County Juvenile Court

Judgments Appealed From Are:  Reversed and Appellant Discharged

Date of Judgment Entry on Appeal: September 27, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Alex Scott Halvin*, Assistant Prosecuting Attorney, for Plaintiff-Appellee State of Ohio,

*Raymond T. Faller*, Hamilton County Public Defender, and *Jessica Moss*, Assistant Public Defender, for Defendant-Appellant S.J.

**KINSLEY, Judge.**

{¶1} Rodney King. Eric Garner. Walter Scott. George Floyd. These men and the stories of their violent encounters with police are known today because citizen journalists created spontaneous recordings of law enforcement activity in public. *See* Simonson, *Copwatching*, 104 Cal.L.Rev. 391, 408 (2016). As these cases demonstrate, video recordings can promote accountability and public discourse when law enforcement officers fail to perform their jobs in a safe and lawful manner. *Id.* And video recordings can also exonerate police officers from baseless accusations by individuals as well. *Fields v. City of Philadelphia*, 862 F.3d 353, 355 (3d Cir.2017). In total, recording police activity in public merely promotes the truth.

{¶2} But for defendant-appellant S.J., a 16-year-old girl who attempted to record the police arresting another person in broad daylight on a public sidewalk, her effort at recording landed her in handcuffs and ultimately adjudicated of four juvenile delinquency offenses.

{¶3} In her two assignments of error, S.J. challenges the sufficiency and weight of the evidence supporting her adjudications of delinquency for obstruction of justice, resisting arrest, disorderly conduct, and escape. Following our review of the record, we hold that S.J.'s adjudications of delinquency as to all charges were not supported by sufficient evidence. Accordingly, the judgments of the juvenile court are reversed, and S.J. is discharged.

### *Factual and Procedural Background*

{¶4} On October 6, 2020, delinquency complaints were filed in the Hamilton County Juvenile Court alleging that S.J. had engaged in acts that would have

2

constituted the offenses of obstruction of official business, resisting arrest, disorderly conduct, and escape had they been committed by an adult.

{¶5} At trial, Cincinnati Police Officers Oscar Cyranek and Tammy Hussels testified that on the date of the incident, they responded to a call that shots had been fired in the area. The officers activated their body-worn cameras when they arrived at the scene, and this footage was played at trial.

{¶6} The body-worn camera footage captured quite a bit of the shooting suspect's arrest. The suspect appeared to be a young male. During his arrest, he made comments about the perceived injustice of the encounter. He remarked, for example, on the alleged double standard that allows police officers to carry firearms but subjects him to arrest for having one. He struggled somewhat with being handcuffed.

{¶7} The suspect's arrest involved multiple officers and occurred against the side of a building near a parking lot. The area contained small stores directly adjacent to one another, sidewalks, and a four-lane road. Cars could be seen driving by in the body-worn camera footage. Essentially, the arrest occurred in an open and public space.

{¶8} While the suspect in the shooting case was being arrested, Cyranek testified that he noticed S.J. recording the arrest on her cellphone. S.J. was initially standing past the edge of the sidewalk, adjacent to the parking lot and slightly into the street. The lane of traffic S.J. was standing in had been partially blocked off by two of the police cars.

{¶9} Cyranek testified that upon noticing S.J., he requested that she "back up" and "go away" in the interest of safety. S.J. complied and moved further into the street in response to Cyranek's command to back up. From there, she continued to

record the police activity. Cyranek testified that after the suspect was arrested and his weapon was secured, S.J. was still standing in the street recording on her phone.

{¶10} Cyranek then told S.J. to "walk away" and "get off the street." He did not tell her where she could go to record or direct her to a new location. S.J. responded by shaking her head and telling Cyranek to stop talking to her. Cyranek testified that he attempted to grab S.J.'s arm to force her off the street. When he reached for S.J.'s arm, S.J.'s recording was obstructed. She backed up and repeatedly said, "Do not touch me." She moved in the direction of the sidewalk at that point, although her movement was obstructed by the police cars separating her location in the street from the sidewalk. S.J. could no longer record the encounter once Cyranek grabbed for her arm. Cyranek's body-worn camera also disengaged and quit recording at this time as well. Their location blocked S.J.'s view of the arrest of the other person.

{¶11} Cyranek conceded that his directions to S.J. may not have been clear, but because he believed she was not fully complying, he decided to arrest her for obstruction of official business. He did not inform S.J. that she was under arrest, nor did he tell her that she had committed the offense of obstruction of official business.

{¶12} Cyranek and S.J. eventually moved onto the sidewalk between two police cars where Cyranek placed S.J. under physical arrest. Hussels testified that while she was rendering the suspect's gun safe, she noticed Cyranek struggling with S.J. Despite not knowing what had transpired, Hussels testified that she went to assist.

{¶13} When Hussels arrived, Cyranek was performing a takedown maneuver on S.J. Hussels testified that she asked S.J. to put her hands behind her back, but S.J. did not. Hussels then pulled out a chemical irritant and moved S.J.'s head back, so she could use the chemical irritant on S.J.

4

{¶14}  Without providing a verbal warning to S.J., Hussels sprayed S.J. with the chemical irritant.  Because S.J. had one hand up at the time, the spray scattered onto both Hussels and Cyranek, who felt it in their eyes as well.  Both Hussels and Cyranek were in severe pain at this point.  As depicted on Hussels's body-worn camera footage, S.J. was also screaming in pain.

{¶15}  S.J. had been partially placed in handcuffs at the time, but because the handcuffs were not secured, S.J. freed her left hand momentarily.  S.J. wiped her eyes with her freed hand and stood up, with Hussels's hands on her the entire time.  S.J. was placed in handcuffs again.  But, this time, the handcuffs were fully secured.

{¶16}  After the bench trial concluded, the magistrate dismissed all the charges against S.J.  The state filed an objection to the magistrate's decision, asserting the magistrate applied an improper legal standard and that the decision was against the manifest weight of the evidence.  Following a hearing on the objection, the juvenile court granted the state's objection and adjudicated S.J. delinquent on all charges.  The juvenile court's findings of delinquency were accompanied by a disposition order.

{¶17}  S.J. now appeals.

### Sufficiency and Weight

{¶18}  In her two assignments of error, S.J. argues her adjudications of delinquency for obstruction of official business, resisting arrest, disorderly conduct, and escape were not supported by sufficient evidence and against the manifest weight of the evidence.

{¶19}  Challenges to the sufficiency and weight of the evidence in a juvenile case are reviewed under the same standards of review applied in adult criminal cases. *In re R.B.*, 2021-Ohio-3749, 179 N.E.3d 749, ¶ 14 (1st Dist.); *In re D.C.*, 2019-Ohio-

5

4860, 149 N.E.3d 989, ¶ 11 (1st Dist.). In a challenge to the sufficiency of the evidence, the question is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶20} But when considering a challenge to the weight of the evidence, the court must review the entire record, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

### Obstruction of Official Business

{¶21} To support an adjudication for obstructing official business in violation of R.C. 2921.31(A), the state had to prove S.J. "(1) performed an act; (2) without privilege; (3) with purpose to prevent, obstruct, or delay the performance of a public official of any authorized act within the public official's official capacity; and (4) that hampered or impeded the performance of the public official's duties." *State v. Brantley*, 1st Dist. Hamilton No. C-210258, 2022-Ohio-597, ¶ 16.

{¶22} S.J. argues that she did not engage in an affirmative act, that it was not her intent to hamper or impede the official business of the officers, and that her conduct did not result in a substantial stoppage of the officers' official business. In response, the state contends S.J. hampered or impeded the officers' ability to secure the scene due to her refusal to leave the street.

{¶23} The complaint for obstructing official business alleged that S.J. "refuse[d] to get out of public street after being told several times by officer while officers were arresting another suspect with gun." And when the magistrate inquired

as to what the basis for S.J.'s arrest was, Cyranek testified that S.J. "was taking me out of helping the other officers with the arrest. To me that is obstruction." We must therefore determine whether this alleged conduct constituted obstruction of official business.

### a. Affirmative Act

**{¶24}** Obstruction of official business requires an affirmative act. *State v. Grice*, 180 Ohio App.3d 700, 2009-Ohio-372, 906 N.E.2d 1203, ¶ 9 (1st Dist.). "A person cannot be guilty of obstructing official business by doing nothing or failing to act." *State v. Wellman*, 173 Ohio App.3d 494, 2007-Ohio-2953, 879 N.E.2d 215, ¶ 10 (1st Dist.). Further, "[m]ere failure to obey an officer's order does not give rise to obstruction." *State v. Carroll*, 162 Ohio App.3d 672, 2005-Ohio-4048, 834 N.E.2d 843, ¶ 14 (1st Dist.).

**{¶25}** When Cyranek initially requested that S.J. "back up," she complied right away. She moved further into the street and away from the scene of the arrest. But when Cyranek requested that S.J. "get off the street," she shook her head and told him to stop talking to her. Neither encounter is evidence of an affirmative act. The first encounter demonstrates S.J.'s compliance, while the second demonstrates her inaction. An affirmative act, however, requires more than this. S.J.'s failure to obey Cyranek's orders does not amount to an affirmative act, and her adjudication was not supported by sufficient evidence as to this element. *See id*.

### b. Purpose

**{¶26}** But even if there was an affirmative act, "the nature of a defendant's conduct must be such that a trier of fact can reasonably infer that the accused intended his conduct to obstruct official business." *In re Payne*, 1st Dist. Hamilton No. C-

040705, 2005-Ohio-4849, ¶ 15. To constitute obstruction, a defendant must act with purpose, meaning it is his or her specific intention to cause a certain result or engage in a conduct of a certain nature. R.C. 2901.22(A).

{¶27} For example, in *State v. Brantley*, the defendant directly interfered with the officers' investigation and even admitted he was trying to prevent the officers from gaining access to his vehicle. *State v. Brantley*, 1st Dist. Hamilton No. C-210258, 2022-Ohio-597, ¶ 19. Thus, this court concluded it was the defendant's "conscious decision to act contrary to [the officer's] instruction." *Id.* Comparatively, in *Garfield Hts v. Simpson*, the court held there was no evidence that the defendant intentionally impeded the execution of a search warrant where he was simply trying to fulfill his duties as a security guard. *Garfield Hts v. Simpson*, 82 Ohio App.3d 286, 291, 611 N.E.2d 892 (8th Dist.1992).

{¶28} The facts here are more akin to those presented in *Garfield Hts*. The state did not present any evidence that it was S.J.'s specific intention to impede the officers' duties or act contrary to their instructions. Rather, S.J.'s conduct clearly indicated that it was her intent to record the arrest of the suspect. Just like the defendant in *Garfield Hts*, S.J.'s passive activity of recording police activity in public did not intentionally impede Cyranek's arrest of the shooting suspect. *See id.* at 288. The nature of S.J.'s conduct was not such that a trier of fact could reasonably infer that she intended her conduct to obstruct official business. *See In re Payne* at ¶ 15.

{¶29} This conclusion is all the more warranted given both the First Amendment privilege to record police activity in public, discussed below, and evidence presented at trial about police policies respecting a citizen's right to record.

{¶30} As Cyranek testified, the Cincinnati Police Manual of Policies and Procedures provides that when an officer observes a citizen video recording, the officer

shall not intentionally block or obstruct the recording device. Cyranek also testified that the manual provides that if a citizen is recording from a position that threatens public safety, the officer shall direct the citizen to move to a position where the safety risk is lessened.

**{¶31}** Cyranek did not comply with this guidance. Rather, he interfered with S.J.'s recording and failed to provide a location from which she could safely record.

**{¶32}** As a matter of law, however, S.J. was privileged to record the arrest, because "the First Amendment protects the right to record the police." *Turner v. Driver*, 848 F.3d 678, 690 (5th Cir.2017); *see Hils v. Davis*, S.D.Ohio No. 1:21-cv-475, 2022 U.S. Dist. LEXIS 44205, 19 (March 14, 2022). As the court explained in *Glik v. Cunniffe*:

> In our society, police officers are expected to endure significant burdens caused by citizens' exercise of their First Amendment rights. Indeed, the freedoms of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state. The same restraint demanded of law enforcement officers in the face of provocative and challenging speech * * * must be expected when they are merely the subject of videotaping that memorializes, without impairing, their work in public spaces.

(Internal quotation marks and citations omitted.) (Alterations in original.) *Gilk v. Cunniffe*, 655 F.3d 78, 84 (1st Cir.2011).

**{¶33}** Every federal circuit to consider the question of whether citizens have a First Amendment right to record police activity in public has answered that question in the affirmative. *See Irizarry v. Yehia*, 38 F.4th 1282, 1290-1292 (10th Cir.2022);

*Turner v. Driver*, 848 F.3d 678, 689-690 (5th Cir.2017); *Fields*, 862 F.3d at 353; *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 596 (7th Cir.2012); *Glik*, 655 F.3d at 83; *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir.2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir.1995). As such, S.J.'s purpose in first heeding Cyranek's instructions to step back into the street and then asking not to be touched while she was recording the encounter not only fell short of what was required by the obstruction statute; it was also constitutionally protected under the First Amendment.

### *c. Hamper or Impede*

**{¶34}** Further, "not every act that can conceivably be said to hinder a police officer rises to the level of criminal conduct." *In re Payne*, 1st Dist. Hamilton No. C-040705, 2005-Ohio-4849, at ¶ 16. "[A] police officer is expected to tolerate a certain level of uncooperativeness, especially in a free society in which the citizenry is not obligated to be either blindly or silently obeisant to law enforcement." *Id.* Rather, to rise to the level of obstruction, the conduct at issue must actually hamper or impede the performance of the officer's duties.

**{¶35}** "As the words 'hamper' and 'impede' are not defined in the statute, this court has used the dictionary definitions of the words to conclude that an act violates the law when it creates a 'substantial stoppage' of the officer's progress." *In re R.B.*, 2021-Ohio-3749, 179 N.E.3d 749, at ¶ 18. "This stoppage is not defined by a particular period of time, but it must occur because of the defendant's act." *Grice*, 180 Ohio App.3d 700, 2009-Ohio-372, 906 N.E.2d 1203, at ¶ 12. Any purported delay attributed to the defendant's conduct must be more than de minimus under the circumstances. *In re R.B.* at ¶ 23.

**{¶36}** In *In re M.H.*, this court held there was sufficient evidence to support the defendant's adjudication for obstructing official business where the defendant's

"actions entirely stalled the officers' investigation into the original complaint." *In re M.H.*, 2021-Ohio-1041, 169 N.E.3d 971, ¶ 22 (1st Dist.). There, the officers responded to a dispatch regarding an unruly customer at a store and the defendant matched the description of the alleged assailant. *Id.* at ¶ 2. This court concluded that the defendant "exhibited hostility and unwillingness to cooperate in physical and verbal ways." (Internal quotation marks omitted.) *Id.* at ¶ 22.

{¶37} In so concluding, this court noted that "moving away from and physically resisting officers is sufficient to support a conviction for obstructing official business." *Id.* at ¶ 21 (collecting cases). But in support of its reasoning, this court pointed to cases where either the defendant was the subject of the investigation, or the defendant actively interfered with the investigation. *Id.* Here, S.J. was a mere bystander, not the suspect. This is a key distinction.

{¶38} This court also addressed a bystander's conviction for obstruction of official business in *Grice*, 180 Ohio App.3d 700, 2009-Ohio-372, 906 N.E.2d 1203. There, officers responded to a report of shots fired. *Id.* at ¶ 2. The officers attempted to obtain personal information from those on the scene, and the defendant failed to comply. *Id.* at ¶ 3. Despite the officers' testimony that the defendant impeded the investigation, the court concluded the officers had duly investigated the report. *Id.* at ¶ 10, 14. In so doing, this court highlighted that the officers had "found a gun, spent casings, and a damaged window, and they determined not only that shots had been fired but also from where they had been fired." *Id.* at ¶ 14. Accordingly, this court held the record was devoid of a nexus between the defendant's affirmative act and the alleged obstruction. *Id.* at ¶ 16.

{¶39} Similarly, here, the record is devoid of such a connection. As an initial matter, we note some uncertainty as to what official business the state alleges S.J.

obstructed. The complaint points to S.J.'s failure to comply with Cyranek's commands to get out of the street, but does not identify what other action the police were taking that this failure hampered. At trial, Cyranek testified that S.J. prevented him from helping the other officers with the suspect's arrest. On appeal, the state argues that S.J. impeded Cyranek from securing the scene of the arrest without describing how S.J.'s presence made the area unsafe or from what location she could have lawfully recorded the encounter.

{¶40} The record does not support the conclusion that S.J. hampered Cyranek's official duties under either theory. With regard to the claim that S.J. limited Cyranek's ability to assist in the arrest of the suspect, the body-worn camera footage demonstrates that while Cyranek was engaging with S.J., Hussels had already rendered the suspect's gun safe, and four other officers were arresting the suspect. Therefore, the claim that S.J. took Cyranek away from the arrest is contradicted by clear evidence that there were already enough officers to apprehend the suspect. Additionally, as Hussels testified, part of Cyranek's duties as a backup officer was to ensure that bystanders remained safely on the periphery. Thus, engaging with a bystander on the scene like S.J. was a part of, not in conflict with, Cyranek's official duties. Just as in *Grice*, there is no evidence here that S.J.'s conduct actually resulted in a substantial stoppage of the officers' duties. *See id*. at ¶ 14.

{¶41} Moreover, Cyranek acknowledged the Cincinnati Police Manual policy that when an officer observes a citizen video recording, the officer shall not intentionally block or obstruct the recording device. Cyranek also conceded that if a citizen is recording from a position that threatens public safety, the policy requires the officer to direct the citizen to move to a position where the safety risk is lessened. These were also Cyranek's official duties on the scene, yet he did not comply with this

guidance. Rather, he interfered with S.J.'s recording and failed to provide a location from which she could safely record. Moreover, had S.J. complied with Cyranek's request to move from the street, her ability to continue recording the arrest of the shooting suspect would have been blocked.

**{¶42}** Thus, there is insufficient evidence to demonstrate that S.J. hampered or impeded Cyranek's duties, either in effectuating the arrest of the shooting suspect or securing the scene.

**{¶43}** Given the lack of sufficient evidence to demonstrate the required elements of an affirmative act, purpose, and hampering or impeding an officer's official duties, we sustain S.J.'s assignment of error as to her delinquency adjudication for obstruction of official business.

### *Resisting Arrest*

**{¶44}** R.C. 2921.33(A) provides, "No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another." "A 'lawful arrest' is an element of resisting arrest, and the prosecution must prove beyond a reasonable doubt that the arrest was lawful." *State v. Pitts*, 2022-Ohio-4172, 201 N.E.3d 983, ¶ 13 (1st Dist.). This court has emphasized, "We will not impose a rule that allows a conviction for resisting arrest any time a person flees from the police—there must first be an arrest." *Carroll*, 162 Ohio App.3d 672, 2005-Ohio-4048, 834 N.E.2d 843, at ¶ 14.

**{¶45}** "To be a lawful arrest, the arresting officer must have probable cause or a reasonable basis to believe that the offense for which the defendant has been arrested did, in fact, occur." *Pitts* at ¶ 13. "[T]he evidence must show that the defendant should have reasonably understood that she was being detained." *In re M.H.*, 2021-Ohio-1041, 169 N.E.3d 971, at ¶ 27. Further, "[a] child's age is an important consideration

13

when determining whether the child understood that she was being placed under arrest." *Id.*

{¶46} S.J. contends she was not lawfully arrested, nor did she reasonably understand that she was being placed under arrest. Moreover, she contends that if this court finds she resisted her arrest, she was justified in doing so to protect herself from the use of excessive force.

{¶47} As discussed above, Cyranek did not have probable cause to arrest S.J. for obstruction of official business. And importantly, Hussels testified she did not even know the basis of S.J.'s arrest when she went to assist Cyranek. Likewise in *Carroll*, the second officer on the scene had no knowledge of what had transpired between the defendant and the first officer on the scene. *Carroll* at ¶ 12. Despite this lack of knowledge, the second officer assisted with the defendant's arrest. *Id.* This court held that because the second officer had no knowledge of the basis of the arrest, the second officer could not have arrested the defendant for resisting her arrest. *Id.* Because neither Cyranek nor Hussels had probable cause or a reasonable basis to believe S.J. had committed an offense, there was no lawful arrest. And without a lawful arrest, S.J.'s adjudication for resisting arrest cannot stand.

### *Disorderly Conduct*

{¶48} R.C. 2917.11(A)(4) and (5) provide that no person shall recklessly cause inconvenience, annoyance, or alarm to another person by doing any of the following:

(4) Hindering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender;

(5) Creating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender.

**{¶49}** Though the complaint for disorderly conduct listed every section of R.C. 2917.11, the juvenile court based S.J.'s adjudication of disorderly conduct only on R.C. 2917.11(A)(4) and (5). On appeal, S.J. argues she did not violate either section, but the state addresses only R.C. 2917.11(A)(4). Because the juvenile court based its adjudication on both subsections, we consider S.J.'s conduct under both R.C. 2917.11(A)(4) and (5).

**{¶50}** S.J. argues there was insufficient evidence to support the delinquency finding as to R.C. 2917.11(A)(4), because it was the parked police cars that diverted traffic, not S.J.'s entry into the street. Similarly, in *State v. Gregorino*, the court reasoned, "by closing the street to avoid injuries, the police took away the element of the offense of disorderly conduct under R.C. 2917.11(A)(4)." *State v. Gregorino*, 11th Dist. Portage No. 2003-P-071, 2004-Ohio-4698, ¶ 24.

**{¶51}** Here, the officers' body-worn camera footage and testimony confirms the lane of traffic S.J. was standing in had already been blocked off by the parked police cars. As Cyranek testified, cars were changing lanes considerably south of where S.J. was standing. Thus, the blockage was not due to S.J. herself. And even in S.J.'s absence, traffic would have been diverted due to the parked police cars. Like the court held in *Gregorino*, the actions of the police do not excuse the state from its burden of showing that S.J. was impeding traffic. *Id*. Here, the state did not meet that burden.

**{¶52}** Regarding R.C. 2917.11(A)(5), S.J. argues the juvenile court failed to consider that her actions served a lawful and reasonable purpose. We agree and

further hold that there was insufficient evidence that S.J. created a condition that was physically offensive or presented a risk of physical harm.

{¶53} In *State v. Hall*, the court held the defendant pointing a realistic looking weapon into oncoming traffic was reckless and caused panic and public alarm. *State v. Hall*, 5th Dist. Stark No. 2021CA00153, 2022-Ohio-1736, ¶ 26. And in *State v. Meyer*, this court held the defendant's exercise of his First Amendment right of free expression in protesting an abortion facility served a lawful and reasonable purpose, despite the defendant's use of a grotesque display in front of the facility. *State v. Meyer*, 61 Ohio App.3d 673, 674-76, 573 N.E.2d 1098 (1st Dist. 1988).

{¶54} Given traffic was already being diverted considerably south of where S.J. was standing, it cannot be said that S.J. was causing panic and public alarm, like the defendant in *Hall*. And more importantly, like the defendant in *Meyer*, S.J. was exercising her right to record the arrest under the First Amendment, and her conduct therefore served a lawful and reasonable purpose. *See Irizarry*, 38 F.4th at 1290-1292.

{¶55} Thus, S.J.'s adjudication of delinquency for disorderly conduct was not supported by sufficient evidence.

### *Escape*

{¶56} R.C. 2921.34(A)(1) provides, "No person, knowing that the person is under detention * * * shall purposely break or attempt to break the detention." "Detention" is defined as an arrest by R.C. 2921.01(E). And as previously discussed, a person acts "purposely" under R.C. 2901.22(A) when it is his or her specific intention to cause a certain result or engage in conduct of a certain nature. "Generally, intent is not shown by direct testimony." *State v. Powell*, 177 Ohio App.3d 825, 2008-Ohio-4171, 896 N.E.2d 212, ¶ 27 (1st Dist.). Rather, "intent is shown by looking at the surrounding facts and circumstances." *Id.*

**{¶57}** In *State v. Palmer*, the court held the evidence fit the definition of escape where the defendant knew he was under arrest for a felony, but purposely ran from officers while being fingerprinted. *State v. Palmer*, 7th Dist. Jefferson No. 04-JE-41, 2006-Ohio-749, ¶ 90. Despite ten officers chasing after the defendant and yelling at him to stop, the defendant did not stop voluntarily. *Id*. at ¶ 89. But here, such evidence is lacking.

**{¶58}** As discussed at length above, S.J. was not lawfully arrested. Further, S.J. did not purposely break her detention. The body-worn camera footage shows that after S.J.'s hand slipped out of the handcuff, she rubbed her eyes due to the chemical irritant that had been sprayed. The officers themselves were in severe pain from this chemical irritant. This suggests it was S.J.'s specific intention to ease the pain she was experiencing, not to escape detention. The fact that S.J. was handcuffed again within a very brief time further confirms this intention. S.J.'s adjudication of delinquency for escape was therefore not supported by sufficient evidence.

### *Conclusion*

**{¶59}** The scene of a public arrest can be a stressful environment, particularly when a gun is allegedly involved. It is stressful for the police officers who place their safety at risk and who use the force of the law to make judgment calls in the interests of the community. It is stressful for the person being arrested, whose freedom is at stake, and any of his or her loved ones who may be watching. And it is stressful for bystanders, whose responses may range from relief to curiosity to fear.

**{¶60}** The presence of a cell phone camera in public arrests can lessen the stress for all involved. For officers, it can promote public confidence in highlighting their professionalism, adherence to policy, and truthfulness. *See Fields*, 862 F.3d at 355. For those being accused, it can document their experience and level the power

dynamic with police. For bystanders and the general public, it can promote a discussion of police practices and engender public trust. *See* Simonson, 104 Calif.L.Rev. at 408.

{¶61} S.J.'s effort to document a public arrest unfortunately resulted in her own arrest. But because her adjudications for obstruction of official business, resisting arrest, disorderly conduct, and escape are not supported by sufficient evidence. S.J.'s first assignment of error is sustained. The judgments of the juvenile court are reversed, and S.J. is hereby discharged. S.J.'s second assignment of error, alleging that her adjudications were against the manifest weight of the evidence, is made moot by our disposition of her first assignment of error, and therefore, we do not address it.

Judgments reversed and appellant discharged.

**BOCK, J.,** concurs. **ZAYAS, P.J.,** concurs in part and dissents in part.

**ZAYAS, P.J.,** concurring in part and dissenting in part.

{¶62} Respectfully, I agree with the majority's determination that the adjudication for escape must be reversed, albeit for different reasons. I disagree with the majority on the remainder of its opinion. If the facts and applicable law were as the majority portrayed, I may have agreed with the majority opinion. However, in my view, the majority's opinion misconstrues facts, omits essential details, and is based upon improper factual findings that are unsupported by the record and beyond our authority as a reviewing court.

{¶63} Because the majority glosses over the volatility and evolving situation Cyranek faced at the scene, I will present the facts as captured on the video footage and the testimony of the witnesses.

18

**{¶64}** Officer Hussels testified that she and her partner Officer Pete responded to a shots-fired call on Glenway Avenue. When Hussels arrived, she saw a male matching the description of the suspect firing a pistol while walking on the sidewalk. Hussels approached the suspect while Pete went behind the suspect and attempted to handcuff him. After Hussels removed a gun from his waistband, the suspect refused to place his hands behind his back, struggled to escape, and the scuffle moved into an adjacent parking lot. Hussels immediately called for backup and placed the suspect's gun in her shorts pocket. She did not have time to clear the gun as the suspect continued to resist arrest.

**{¶65}** When Cyranek arrived on the scene, two officers were still struggling to place handcuffs on the suspect. Cyranek immediately went to assist the officers. Cyranek's body-camera video shows that S.J. was standing in the middle of the street recording. The suspect continued to refuse to place his hands behind his back.[1] Two additional officers arrived to assist with the arrest.

**{¶66}** After one of the officers warned the suspect that he would be tased, Cyranek briefly turned toward S.J. S.J. had moved from the middle of the street to the curb, much closer to the suspect being handcuffed. The video shows that while pointing down the street, Cyranek shouted, "Back off. Back up. Go away." Cyranek quickly turned his back on S.J. to continue assisting the officers who had not yet

---

[1] During the struggle, the suspect repeatedly told the officers to, "Get the fuck off me." He also said, "Call my fucking people. Hey, ya'll going to have to shoot me, I don't give a fuck. I ain't scared. Shoot me n-word, shoot me. My hands ain't going nowhere, my hand's right here, n-word. What the fuck are you talking about? I'll put my hands on you bitch-ass idiots. If you tase me, I swear to God, I'll have you (inaudible). So you all are gonna do this because I got a gun? Fuck ya'll. Ya'll got guns bitch, always (inaudible). I'll spit on you bitch ass n-word. What the fuck you talking about?"

handcuffed the suspect. While S.J. responded, "No. I'm not doing shit but recording how you all (inaudible)," she stepped backwards further into the street.

{¶67} Cyranek testified that S.J. was too close to the scene, and his primary concern was safety. "She appeared to be recording us, which is fine with me, but the problem is safety of everyone on the scene." Cyranek admitted that he should have been clearer in his instructions, but he did not have time to approach her or look for a safer place for her to record because the suspect was still resisting. Cyranek "[didn't] care [that she was recording.] We have body cams on us. No. She has the right to record." He further testified that his primary concern was her proximity to the scene. This first encounter was not the basis of the obstruction charge.

{¶68} With the help of a fourth officer, the suspect was finally handcuffed, and a female voice can be heard on the video shouting, "Get out of the street." The suspect continued to struggle and resist as the officers searched him and led him toward a police cruiser. The suspect jumped on the front of the cruiser, and the video shows two officers detaining the suspect on the cruiser parked partially on the sidewalk. Contrary to the majority's assertion, the video never depicts the suspect secured in a police vehicle.

{¶69} While the officers escorted the suspect to the cruiser, S.J. was visible in the video, almost on the sidewalk. Cyranek turned and walked toward her, saying, "Walk away ma'am. Get off the street. Get off the street right now." S.J. shook her head no, began backing up into the street, and responded, "Stop talking to me." He reached for S.J. because "[he] wanted to escort her off the street." At that point, S.J. repeatedly shouted, "Don't touch me," and swung at Cyranek with her phone in her hand. The video shows S.J. continuing to walk backwards in the street, backing away from Cyranek while telling him not to touch her. Cyranek's video stopped recording,

but Hussels's video showed that while Cyranek was walking toward her and pointing toward the sidewalk, S.J. continued to walk backward and remain on the street.

{¶70} After taking many steps, Cyranek and S.J. approached the two parked cruisers, one on the sidewalk and one on the street, that were up the street from where S.J. was initially recording. As they approached the vehicles, Hussels was visible clearing the suspect's gun. The suspect was still being held on the front of Cyranek's cruiser and shouting at the officers. Cyranek and S.J. disappear for a brief amount of time, then reappear on the sidewalk struggling. Hussels ran toward them and tossed the gun into her cruiser, which was parked on the sidewalk. Hussels and Cyranek eventually detained S.J. who was screaming and struggling.

{¶71} Cyranek testified that he "didn't want her to get struck by a car. Obviously, traffic is going, and Glenway is really busy. I mean, there's cars that drive very, very fast over there." Cyranek observed that S.J. "was causing traffic to move because she was standing in the street. No one is going [to] hit her on purpose." He further testified that, "She is obstructing traffic just because the cars don't want to hit her and are changing lanes." But S.J. told him she was not going to comply. Cyranek testified that he told her that she could be arrested if she did not get out of the street.

{¶72} When S.J. was next to the two cruisers, she was still in the street walking backwards. S.J. did not walk toward the sidewalk, so Cyranek walked toward her to force her to walk between the cruisers and onto the sidewalk. Cyranek testified that S.J. never complied with his directive to get off the street and he decided to arrest her "when she was behind the first police car" because she refused to get off the street.

{¶73} The juvenile court made the following factual findings, which were supported by the record:

In the case at bar, Juvenile was standing in the middle of the road, impeding traffic. Although there were police cruisers in the road, they were further down the road than Juvenile was. Officer Cyranek directed Juvenile to back up, and get off the street, Juvenile refused to comply and prevented or delayed Officer Cyranek from further assisting the other officers in order to get her to comply. Juvenile failed to heed Officer Cyranek's orders, and was standing in the street, creating a danger to herself and others.

### *Obstruction of Official Business*

**{¶74}** The majority concludes that S.J.'s conduct was not an affirmative act because she "shook her head and told him to stop talking to her" when Cyranek instructed her to get out of the street. A review of the record revealed more than sufficient evidence that S.J. engaged in an affirmative act. The video shows that S.J. swung her arm at Cyranek, repeatedly shouted at him, repeatedly disregarded his instructions, and continued to walk in the street. Thus, viewed in the light most favorable to the state, this evidence demonstrates that S.J. performed an affirmative act and did not "merely" fail to obey Cyranek's instruction.

**{¶75}** Next, the majority concludes that "[t]he state did not present any evidence that it was S.J.'s specific intention to impede the officers' duties or act contrary to their instructions." Because a person's intent is within her mind, purpose may be determined by circumstantial evidence and the surrounding facts and circumstances of the case. *See State v. Johnson*, 56 Ohio St.2d 35, 38, 381 N.E.2d 637 (1978). "The intent to obstruct, delay, or prevent a public official from carrying out his

or her duties may be inferred from appellant's actions." *State v. Lee*, 10th Dist. Franklin No. 18AP-666, 2019-Ohio-3904, ¶ 20.

**{¶76}** Instead of complying with Cyranek's instruction, the video shows S.J. exhibiting uncooperative behavior, disregarding Cyranek's instruction to get out of the street, and continuing to walk in the street. Cyranek testified that "she was still on the street, * * * and she wasn't complying with me." S.J.'s refusal to get on the sidewalk required him to focus on her instead of arresting the suspect and securing the scene. The evidence established that S.J. made a conscious decision to act contrary to Cyranek's instructions. Thus, the fact finder could have reasonably concluded that S.J. purposefully impeded Cyranek. Accordingly, the evidence supports that S.J.'s acts resulted in more than a de minimus delay in the performance of Cyranek's lawful duties.

**{¶77}** Finally, the majority holds that S.J. did not hamper or interfere with Cyranek's duties because "the body-worn camera footage demonstrates that while Cyranek was engaging with S.J., Hussels had already rendered the suspect's gun safe, and four other officers were arresting the suspect" and "part of Cyranek's duties as a backup officer was to ensure that bystanders remained safely on the periphery." However, "S.J. does not contest that the officers were acting in the performance of their lawful duty." *See* Appellant's Brief at 9.

**{¶78}** Moreover, Cyranek was unable to secure the periphery of the scene while he was down the street trying to get S.J. to comply with his instruction to move out of the street. Additionally, Cyranek's uncontested testimony was that S.J.'s conduct impeded him from assisting the other officers, which included placing the suspect in the cruiser and securing the scene, which in this case, as Cyranek testified, may have included recovering casings that were discharged from the gun. The suspect

had not been placed in the cruiser when Hussels ran to assist in S.J.'s arrest. To the extent that the majority evaluates the credibility of Cyranek's testimony in reaching its conclusion, the fact finder—not this court—determines which witnesses should be believed, and which witnesses should not. Here, the juvenile court found Cyranek's testimony to be credible and determined that S.J. "prevented or delayed Officer Cyranek from further assisting the other officers."

**{¶79}** The majority concludes that S.J.'s intent "was to record the arrest of the suspect" which was "constitutionally protected under the First Amendment." Undoubtedly, S.J. initially intended to record the arrest. When Cyranek told her to get out of the street, she was a few steps from the sidewalk. If her sole intent was to continue to record, S.J. could have walked onto the sidewalk and continued to record. Instead, S.J. chose to respond with "no" and "don't talk to me" and remain in the street. Cyranek never told her to stop recording. Rather, he testified repeatedly that he did not care that she was recording, and that his concern was for her safety and "never with her recording." S.J.'s own actions impeded her ability to record.

**{¶80}** Moreover, "the First Amendment has never conferred an absolute right to engage in expressive conduct whenever, wherever, and in whatever manner a speaker may choose." *State v. Geary*, 2016-Ohio-7001, 72 N.E.3d 153, ¶ 20 (1st Dist.), citing *State v. Condon*, 152 Ohio App.3d 629, 2003-Ohio-2335, 789 N.E.2d 696, ¶ 23 (1st Dist.), quoting *Cincinnati v. Thompson*, 96 Ohio App.3d 7, 16, 643 N.E.2d 1157 (1st Dist.1994). First Amendment conduct "is subject to time, place, and manner restrictions." *Id.* "[W]hile individuals have a right to freedom of speech and expression, the government can place reasonable restrictions on the time, place, and manner of the exercise of those rights. Certainly, prohibiting individuals from standing in a roadway is an example of such reasonable restriction." *State v.*

*Gregorino*, 11th Dist. Portage No. 2003-P-0071, 2004-Ohio-4698, ¶ 37. *See also Cleveland v. Egeland*, 26 Ohio App.3d 83, 497 N.E.2d 1383 (8th Dist.1986), paragraph one of the syllabus ("The offender's conscientious belief in the importance of the subject about which he demonstrates does not provide him with a lawful privilege to obstruct the roadway."); *State v. Amireh*, 2016-Ohio-1446, 62 N.E.3d 672, ¶ 20 (4th Dist.) (holding that the "protest of a tuition increase was not a lawful or reasonable purpose to be in the street."); (Emphasis in original.) *Am. Civil Liberties Union: of Illinois v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012) ("While an officer surely cannot issue a 'move on' order to a [bystander] *because* he is recording, the police may order bystanders to disperse for reasons related to public safety and order and other legitimate law-enforcement needs. Nothing we have said here immunizes behavior that obstructs or interferes with effective law enforcement or the protection of public safety.").

**{¶81}** I disagree with the majority's assertion that Cyranek failed to comply with the guidance from Cincinnati Police Manual of Policies and Procedures by failing to direct S.J. to a safe location to record. First, I note that the manual was not made part of the record and the majority's determination is based on Cyranek's limited responses regarding the manual. I further note that Cyranek testified that, during the first encounter, he did not have time to direct her because the suspect was actively resisting arrest. With respect to the second encounter, Cyranek did in fact direct S.J. to a safe location to record when he instructed her to get out of the street and pointed toward the sidewalk.

**{¶82}** Based on this record, the state presented sufficient evidence to show that S.J. obstructed official business.

### *Resisting Arrest*

**{¶83}** Having determined that the state proved that S.J. committed obstruction, I would hold her arrest was lawful. To adjudicate S.J. of resisting arrest, the state had to prove that she recklessly or by force resisted or interfered with her lawful arrest. R.C. 2921.33. The body-camera video depicts S.J. pulling away from and struggling with Cyranek as he attempted to arrest her. S.J. refused to place her hands behind her back after numerous requests from Cyranek. Hussels testified that she sprayed a chemical irritant because S.J. refused to comply with their attempts to handcuff her. S.J.'s adjudication for resisting arrest was supported by sufficient evidence and not against the weight of the evidence. *See, e.g., State v. Carter*, 1st Dist. Hamilton No. C-220030, 2022-Ohio-3901, ¶ 17 (holding that conviction for resisting arrest was supported by sufficient where defendant repeatedly refused to follow the officer's commands); *State v. Williams*, 5th Dist. Fairfield No. 2021 CA 00014, 2021-Ohio-4200, ¶ 34 (evidence that defendant refused to comply with officer's requests and struggled with officers sufficient to prove resisting arrest).

**{¶84}** S.J. was adjudicated delinquent for disorderly conduct under R.C. 2917.11(A), a minor misdemeanor.[2] The majority concludes that the state failed to prove that S.J. recklessly caused inconvenience to another person by hindering or preventing the movement of persons on a public street "because it was the parked police cars that diverted traffic, not S.J.'s entry into the street." Yet, that factual finding is unsupported by the record. When Cyranek approached S.J., she was standing in the road impeding traffic. The video shows that the two police cars were

---

[2] Although S.J. was charged with persistent disorderly conduct, the juvenile court adjudicated her under R.C. 2917.11(A), a minor misdemeanor.

further down the street and were not diverting traffic where S.J. was standing. Cyranek's uncontroverted testimony was that S.J. obstructed traffic, and cars were changing lanes to avoid hitting her. The trial court found Cyranek's testimony to be credible, and that, "[S.J.]" was in the middle of the road impeding traffic. Although there were police cruisers in the middle of the road, they were further down the road than S.J. was." "We afford substantial deference to credibility determinations because the factfinder sees and hears the witnesses." *See State v. Glover*, 1st Dist. Hamilton No. C-180572, 2019-Ohio-5211, ¶ 30. Moreover, the video is consistent with Cyranek's testimony and the trial court's finding.

{¶85} Accordingly, viewing the evidence in the light most favorable to the state, a rational trier of fact could have found that S.J.'s adjudication for disorderly conduct was supported by sufficient evidence and not against the weight of the evidence.

### *Escape*

{¶86} R.C. 2921.34(A)(1) states, in relevant part, that "[n]o person, knowing the person is under detention * * * or being reckless in that regard, shall purposely break or attempt to break the detention * * *." *State v. Tensley*, 2012-Ohio-4265, 980 N.E.2d 23, ¶ 5 (1st Dist.). For our purposes, " 'Detention' means arrest." R.C. 2921.01(E). "A person is under 'detention,' as that term is used in R. C. 2921.34, when he is arrested and the arresting officer has established control over his person." *State v. Reed*, 65 Ohio St.2d 117, 123, 418 N.E.2d 1359 (1981).

{¶87} The adjudication was based on the trial court's finding that S.J. was "handcuffed," and "slipped her hands out of the handcuffs." However, Hussels testified that she had not secured the handcuffs onto S.J.'s wrists. Because the

handcuffs were never properly secured on S.J.'s wrists, the state failed to establish that the officers had established control over S.J. I would sustain the first assignment with regard to the escape adjudication. *See id.*

### *Conclusion*

**{¶88}** I would sustain the first assignment of error in part, with respect to the adjudication for escape, and reverse that adjudication. I would affirm the trial court's judgments in all other respects.

Please note:

The court has recorded its own entry on the date of the release of this opinion.